UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNNY MONROE,

        Plaintiff,                      Case No. 05-73259

vs.

                                      HONORABLE MARIANNE O. BATTANI
JO ANNE B. BARNHART,              MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Johnny Monroe brought this action under 42 U.S.C. §405(g) and §1383(c)(3) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI. Both parties have filed motions for summary judgment, which have been referred to the undersigned pursuant to 28 U.S.C. 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

    **A.    Procedural History**

Plaintiff applied for DIB and SSI on September 23, 2002, alleging that he had became disabled on October 1, 2000, due to "heart problems, diabetes & arthritis problems w/ rt knee" (R. 3, 67-69, 86). After Plaintiff's application was initially denied, he had a March 11, 2005, hearing before Administrative Law Judge (ALJ) Don A. Harper who issued a decision on April 12, 2005, finding Plaintiff not disabled (R. 17-25). The Appeals Council denied Plaintiff's

request for review (R. 5-8).

>  B.   **Background Facts**
>
>  >  1.   *Plaintiff's Testimony*
>  >
>  >  >  a.   *Pain Questionnaire Form*

In his *Pain Questionnaire* Plaintiff indicated that he began experiencing pain in October 2000 after having a heart attack and his "body never seemed [] to adjust" (R. 103).

His pain was getting worse with time; was located in his knees, hands, elbows, shoulders and left foot; was aggravated by walking and standing. Pain medication and resting improved the pain, which was described as constant and present 90% of the time. He took Vicodin ES and 800 milligrams of Motrin 3 times per day, which took about 30 minutes to work, did not completely relieve his pain and caused some drowsiness (R. 104). He had not had physical therapy and used rest and heat to alleviate pain.

He could walk one block in 2 minutes before he had to stop due to knee pain and shortness of breath. He could stand in 30 minute intervals, lift and carry 20-25 pounds and had "some" limitations in using his arms and hands (R. 105). He needed to change position "from time to time" when sitting and also listed shortness of breath under "other limitations". His doctor had not limited his activities and he was able to take care of his own personal needs, though he stated that he only did "what is needed when able".

>  >  >  b.   *Daily Activities Form*

In his *Daily Activities Form* Plaintiff indicated that he usually went to bed at 9:00 p.m. and awoke at 8:00 a.m., though he had trouble sleeping because arthritis pain woke him up (R. 106). He sometimes took naps during the daytime for an hour if he was tired.

He did not require special help with his personal needs and his condition had caused no

changes in his ability to care for himself. He did not fix his own meals, his wife did all the cooking for his whole family. Plaintiff also did not do any housework, or shopping (R. 107). Yet, Plaintiff indicated that there had been no change in how he did housework, shopping or cooking since his illness began.

Plaintiff did not read or have any hobbies but watched television and visited with family when they came to his home (R. 108). He used to hunt, but was no longer able.

### c.   Hearing Testimony

Plaintiff was 45 years old at the time of the hearing, married with no minor children (R. 228). He completed the tenth grade and stated that he could not read or write very well (R. 228-229). He could not read cursive and could do only minimal math (R. 229).

Plaintiff was 6 feet tall and weighted 300 pounds (R. 230). His impairments began in October 2000 and he stopped working in 2002. He last worked as a mechanic performing as a heavy repair specialist (R. 231).

He experienced fatigue, pain and an inability to concentrate when he was working, and described his most serious problem which prevented him from working as "pain, sleep" (R. 232). The pain was in his knees, hips and hands. When asked what conditions prevented him from working he stated "pain, uncomfort [sic], can't stand, can't sit, don't sleep, fall asleep". He stopped working in 2000 due to a heart attack, which he explained caused him to be drowsy, unable to focus and required "a lot of medications" (R. 233). He had pain and throbbing in his knees and could stand for 15 minutes to one-half hour. He could sit for one-half hour to one and one-half hour. He believed pain, drowsiness, inability to focus and inability to sit or stand for long periods of time prevented him from performing a light job which allowed a sit/stand option (R. 233-234, 236).

Plaintiff spent his days moving around trying to get comfortable and spent five to seven hours each day laying down in a recliner with his legs elevated (R. 234). He took naps during the daytime and did not sleep at night. His medications made him drowsy and weak and Vicodin, which he took every fours hours, left him unable to concentrate. His daily activities also including "making sure the bathroom is picked up" and maybe setting the garbage outside the door or putting away dishes (R. 235). He did not do yard work nor leave the home to go out or do shopping, though he did occasionally go out to eat. He could make himself a sandwich or cereal, but did not cook. He drove a car approximately once per week (R. 237).

### *2.     Medical Evidence*

An October 31, 2000, Cardiolite stress test revealed an anterior wall scar with surrounding ischemia, inferior wall scar with fixed perfusion defect and an left ejection fraction of 45% (R. 192). On November 1, 2000, Mr. Monroe was hospitalized overnight when he experienced acute myocardial infarction due to coronary artery disease (R. 122). Tests showed a 99-percent occlusion of the left anterior descending artery, which was treated through angioplasty and placement of a stent (R. 122). The procedure was performed without complications and resulted in restored blood flow (R. 127).

On August 28, 2002, Plaintiff visited Michael Schaeffer, M.D., as a new patient in order to establish care (R. 145). He reported that he was not followed by a cardiologist regarding his atherosclerotic heart disease (ASHD). He also reported that he took his medication without difficulty; was not experiencing chest pain, shortness of breath, headaches, visual changes, numbness or tingling in his extremities or swelling in his ankles; and he had diabetes. Plaintiff described a six-month history of right knee pain related to a car accident. Dr. Schaeffer's examination revealed a small amount of right knee effusion and joint laxity and full range of

motion with some pain at the end of extension (R. 145). He opined that Plaintiff had atheroscerotic heart disease, diabetes mellitus type 2, hyertension (suboptimal control), hypercholesterolemia, right knee pain and was a smoker. He refilled Plaintiff's Vicodin prescription (one tablet 2-3 times per day), referred him to an orthopedist regarding his knee, and ordered a stress test and fasting bloodwork (R. 146).

A September 6, 2002, cardiac stress test suggested stress-induced ischemia, a below-normal ejection fraction and hypokinesia in the apex, adjacent anterior wall and part of the septum (R. 149).[1] The following month, on October 1, 2002, Plaintiff, who complained of shortness of breath and fatigue, underwent left cardiac catherization, left and right selective coronary angiogram and left ventricular angioigram, which revealed that the stented artery (the left anterior descending) was patent with no occlusion and Plaintiff had normal left ventricular systolic function with mild coronary artery disease (R. 131, 139). Plaintiff had normal ejection fraction of approximately 60 percent (R. 137-138).

On September 9, 2002, Plaintiff was seen by Kevin T. Crawford, D.O., for right knee pain that started after an automobile accident two and a half months earlier (R. 194). The knee had swollen on and off since the accident for five days to two weeks at a time. The knee pain was most prevalent after long working days. Plaintiff also complained of right elbow pain, which was exacerbated by increased activity. Physical examination revealed no gross deformity in the right knee, full range of motion, with an inability to actively extend to zero degrees, full strength, laxity of the anterior cruciate ligament and some point tenderness. The right elbow was tender posterolaterally with full range of motion. Pain was present at extremes of passive

---

[1] Ejection fraction is the percentage of blood pumped out of the left ventricle with each heartbeat; a normal ejection fraction is around 60 percent. *The Merck Manual of Medical Information (Home Edition)* 129, 154 (Mark H. Beers, M.D., ed., 2d ed. 2003).

flexion and active supination. Plaintiff had full strength and neurovascular competency. X-rays revealed mild degenerative changes in the right knee, including flattening of the tibial plateau and spurring. A October 16, 2002, right knee MRI revealed no joint effusion or bone contusion, but a possible partial anterior cruciate ligament tear and/or tenosynovitis and possible grade 1 tear or myxodegeneration of the anterior horn of the lateral meniscus (R. 193). On October 24, 2002, Dr. Crawford explained that arthrosporic surgery could provide some relief of Plaintiff's knee pain but would not improve the arthritis. Thus, he could not "overwhelmingly" recommend the surgery (R. 195).

December 16, 2002, nerve conduction studies showed evidence of carpal tunnel syndrome bilaterally, right greater than left, with no evidence of peripheral neuropathy (R. 152, 196).

At the request of the state agency, John Boston, D.O., examined Plaintiff on February 14, 2003 (R. 153-58). Plaintiff complained of "occasional" chest pain that occurred about once a month and lasted for five minutes and was accompanied by shortness of breath (R. 153). He reported smoking one pack of cigarettes each day. He also complained of back and knee pain, reporting that he could stand for one hour, walk for 15 minutes and sit for 45 minutes. He reported no problem lifting as long as he did not have to use his knees. He also described right hand numbness, but said he could open a jar, button clothes, pick up coins and tie shoelaces without difficulty. On examination, Dr. Boston observed no obvious joint deformities and Plaintiff was noted to have normal range of motion with pain (R. 155). Plaintiff walked normally without an assistive device, had no muscle spasm and full dexterity and grip strength in his hands and he could pick up coins, button, and open a door with both hands. There was moderate difficulty squatting and an inability to hop, but no difficulty getting on or off of the

examination table and no difficulty heel and toe walking. Reflexes were normal and motor function was 5/5 with the exception of the left lower extremity, which was 4/5 (R. 157). Sensation was decreased in the C8 area of his right arm.

On February 18, 2003, Plaintiff was seen by cardiologist Rajesh C. Gulati, M.D., on referral from Dr. Schaeffer (R. 189). Dr. Gulati recommended continuing Plaintiff's current medical therapy and regular visits with Dr. Schaeffer.

Mr. Monroe also saw Dr. Schaeffer on February 18, 2003, reporting no chest pain, shortness of breath, headaches, visual changes or numbness in his feet (R. 190). He continued to complain of numbness and tingling in both hands due to carpal tunnel, along with pain in his right knee. Plaintiff reported that he was following up with orthopedics. Dr. Schaeffer's examination showed no abnormalities. Dr. Schaeffer counseled on smoking cessation and weight loss and advised Plaintiff to see a hand surgeon.

On February 26, 2003, "S. Torrez, Enhanced Examiner," completed the *Physical Residual Capacity Assessment Form* opining that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk 6 hours in an 8-hour workday, sit for 6 hours in an 8 hour workday and occasionally climb, balance, stoop, kneel, crouch and crawl (R. 160-161). The examiner indicated that, although Plaintiff complained of pain and in ability to do work around the house or shopping, there was no medical evidence to support his inability to do such activities (R. 164).

On March 21, 2003, Plaintiff reported a new complaint of left-sided low back pain and explained that his wife was worried that he had a kidney stone (R. 178). Dr. Schaeffer's examination showed diffuse discomfort over the left paraspinal muscles and a positive straight leg-raise test. He observed no back swelling, no pain with palpation, good hip motion, no

obvious sensory or motor deficits and intact reflexes. Dr. Schaeffer thought Mr. Monroe had a possible lumbar strain and recommended use of a heating pad and Vicodin for pain.

At his next visit in May 2003, Plaintiff reported feeling "fairly well," though he was still bothered by hand discomfort and knee pain (R. 175). Plaintiff complained of frequent discomfort from bilateral carpal tunnel and knee pain. He reported having good days and bad days. Plaintiff requested that his Vicodin prescription be changed to allow him to use more of the medication as needed. Dr. Schaeffer declined this request, explaining that if Plaintiff really needed more than four tablets per day, this indicated a worsening of his symptoms and he would need to consider surgical intervention (R. 176). Dr. Schaeffer refilled his prescriptions and counseled on diet and smoking cessation.

On August 26, 2003, Plaintiff complained to Dr. Schaeffer of pain in both knees, as well as his hips, elbows and shoulders, but no chest pain or difficulty breathing (R. 173). Dr. Schaeffer's examination showed no obvious inflammation or arthritic changes in Plaintiff's shoulders, elbows, wrists or hips and he recommended heat and low impact exercise to improve joint symptoms. Dr. Schaeffer diagnosed probable osteoarthritis, bilateral carpal tunnel, diabetes, hypertension, hypercholesterolemia and ASHD. Dr. Schaeffer also ordered blood tests to check Plaintiff's diabetes control. Plaintiff returned on November 12, 2003, having neglected to undergo the blood tests, explaining that he had been very busy babysitting his grandchildren (R. 171). Plaintiff was still smoking one pack of cigarettes per day and expressed concern regarding his inability to lose weight and complained of bilateral carpal tunnel pain in his hands and arthritic pain in both knees (left more than right), hips, low back and neck. Plaintiff continued to refuse surgical intervention for his hands. He was not experiencing chest pain or difficulty breathing. Dr. Schaeffer diagnosed atherosclerotic heart disease, diabetes (suboptimal

control), hypercholesterolmemia, hypertension, bilateral carpal tunnel syndrome, osteoarthritis and tobacco addiction and advised him to follow-up with an orthopedist for his knee and counseled him regarding diet and exercise.

On February 13, 2004, Plaintiff reported to Dr. Schaeffer that his hand and knee pain continued, but he was not experiencing any chest pain, difficulty breathing or swelling in his ankles (R. 210). On October 15, 2004, Plaintiff complained of increased carpal tunnel pain and arthritic type pain in his wrists, hands and knees (R. 212). Dr. Schaeffer's examination showed both hands were normal to inspection, no obvious joint inflammation, mild crepitus (a crackling or grating sound) in his knees and no other obvious abnormalities. Dr. Schaeffer discussed adding a new medication, Neurontin, but Plaintiff refused. Plaintiff also refused an evaluation by a hand surgeon or further work-up by an orthopedist. Dr. Schaeffer again counseled him on diet and exercise.

On December 8, 2004, Plaintiff complained that his knees were "a little worse" and his fingers on his right hand were swollen (R. 213). He requested a referral to orthopedics and an arthritis work-up. Dr. Schaeffer observed mild arthritic changes in the PIP and DIP joints of Plaintiff's hands, but no active synovial inflammation and some crepitus but no active inflammation and no obvious effusion or erythema. Dr. Schaeffer felt the swelling in the right hand was likely due to carpal tunnel and Plaintiff again refused a referral to a hand specialist or "any intervention' for his hands. Plaintiff was referred to an orthopedist for consideration of a steroid injection. Dr. Schaeffer completed a *Physical Capacities Evaluation Form*, in which he opined that Plaintiff could sit for two hours per day, stand for two hours per day and walk one half to one hour per day (R. 203). He indicated that Plaintiff needed to lie down for substantial periods during the day, needed complete freedom to rest frequently without restriction and could

9

not use his hands for grasping, pushing, pulling or manipulating (R. 203-205). Plaintiff could occasionally lift and/or carry 11-20 pounds and frequently lift and/or carry 10 pounds (R. 204). Plaintiff could never stoop, squat, crouch, crawl or climb but could reach above his shoulders (R. 205). Plaintiff could not work around unprotected heights or moving machinery but could occasionally be exposed to marked changes in temperature and drive automotive equipment (R. 206). In response to the question regarding what diagnoses provided the basis for his opinion, Dr. Schaeffer responded: bilateral carpal tunnel syndrome and osteoarthritis in the knees and hips requiring narcotic medication (R. 207).

A January 1, 2005, Cardiolite stress test revealed a slightly enlarged left ventricle, when compared to September 2002 study – the results suggested stress-induced ischemia in the anterior wall above the apex and a 50% ejection fraction with hypokinesia (R. 208).

On February 1, 2005, Plaintiff was seen for a follow-up after angioplasty (R. 214). He reported feeling good since the procedure, though his hips and knees were bothering him significantly. He indicated that he scheduled a follow-up with his orthopedist. Dr. Schaeffer counseled on "lifestyle changes".

### 3. *Vocational Evidence*

Vocational expert (VE) Samuel Goldstein, Ph.D., testified at the administrative hearing (R. 39, 225, 239-41). ALJ Harper asked VE Goldstein to consider a hypothetical individual of Plaintiff's age, education and work experience that could perform work at the light level of exertion, but was limited to no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; had to avoid pushing and pulling with the upper and lower extremities; and needed to avoid climbing and descending stairs (R. 239-240). VE Goldstein testified that such an individual could not perform plaintiff's past work, but could perform work as an

inspector or packager (R. 240). Approximately 15,000 to 17,000 such jobs existed in the regional economy.

ALJ Harper next asked VE Goldstein to consider the same hypothetical person with the additional limitations of "problems with fatigue", medication that contributes to drowsiness and significant pain, such that he could not perform a one or two step job. VE Goldstein indicated that such a person could not perform Plaintiff's past work nor any competitive employment.

### 4. The ALJ's Decision

ALJ Harper found that Plaintiff met the non-disability requirements and was insured for benefits through the date of his decision (R. 24).

Plaintiff's coronary artery disease, status post myocardial infarction; bilateral carpal tunnel syndrome; right knee osteoarthritis; diabetes mellitus and obesity were considered severe impairments based on the requirements in the Regulations, 20 C.F.R. §§404.1520(c) and 416.920(c), but these impairments did not meet or equal on of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

Plaintiff's testimony was not totally credible because:

> The claimant's allegations in regard to his activities are not consistent with the evidence of record as noted by Dr. Schaefer who wrote on November 12, 2003 that the claimant failed to get his blood work because he was too busy baby sitting his grandchildren {}. The claimant also is not following his doctor's advice regarding diet and exercise. Progress notes from Dr. Schaeffer continued to note that the claimant denied chest pain, shortness of breath, headaches or visual changes. The claimant was also placed on a 2000 kilocalorie ADA diet and told to exercise as able yet the claimant did not do so. The claimant was also told to stop smoking yet there is no indication in the record that he has quit [].

(R. 22).

Plaintiff had the RFC to perform work at the light exertional level with the following restrictions: occasional climbing, stooping, crouching, kneeling and crawling; avoid pushing and

pulling motions with upper and lower extremities and avoid ascending or descending stairs.

Plaintiff was unable to perform his past work and had no transferrable skills (R. 24-25). Yet, although Plaintiff's exertional limitations did not allow him to perform the full range of light work, ALJ Harper, using the Medical-Vocational Rule 202.18 as a framework and relying upon VE Goldstein's testimony, found that there were a significant number of jobs in the national economy Plaintiff could still perform. Therefore, Plaintiff was not under a disability as defined in the Social Security Act.

## II.  ANALYSIS

### A.  Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.[2] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B. Factual Analysis

Plaintiff argues that ALJ Harper erred in (a.) failing to give proper weight to Plaintiff's treating physician, Dr. Schaeffer and (b.) finding that Plaintiff could perform a limited range of light work.

#### 1. *Treating Source Rule*

In August 1991, the Social Security Administration adopted a regulation in response to the treating physician rules adopted by the various circuits. 20 C.F.R. §404.1527. While the regulation indicates that the Commissioner will generally give more weight to the opinions of treating sources, it sets preconditions for doing so, which are stricter than those established by the Sixth Circuit. The new regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight. Indeed, the Commissioner's use of the "treating source" as opposed to "treating physician" appears to be an effort to distinguish these new regulations from the case law established in the various circuits under the generic term of the "treating physician rule".

Under this regulation, the Commissioner will only be bound by a treating source opinion

---

[2] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. §404.1527(d). In those situations where the Commissioner does not give the treating source opinion "controlling weight," the regulations set out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record. The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion on "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. §1527(d)(2).

Under 20 C.F.R. §404.1527(e), the Commissioner will not defer to treating source opinions on certain subjects that are "reserved to the Secretary." These include:

1. An opinion that claimant is disabled under the "statutory definition of disability."
2. An opinion on the nature and severity of the impairment if that opinion does not meet the "well supported" standard of § 1527(d) set out above.
3. An opinion that the claimant meets the Listing of Impairments.
4. An opinion on the effects of an impairment on the claimant's residual functional or vocational capacity.

Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing or on residual functional capacity.

While 20 C.F.R. §404.1527(a) defines medical opinions to include statements from physicians as to what an individual "can still do despite impairment(s), and [a claimant's] physical or mental restrictions," these factors are different than the issues reserved to the Commissioner, including the individual's residual functional capacity and whether the person can perform other work in the economy and is thus not disabled. See SSR 96-5p and 20 C.F.R.§§404.1527(e) and 429.927(e).

SSR 96-5p notes this difference with regard to residual functional capacity determinations

which include the individual's ability to perform work-related activities based on both medical and non-medical evidence. It points out that the ALJ often has more substantial additional evidence available in making this determination than does a treating source. While the ALJ must consider the opinion of claimant's treating source as to what the claimant can still do, the judgment as to whether claimant has the residual functional capacity for other work involves considerations beyond that medical judgment as to what the individual can still do and is a determination to be made by the ALJ. Furthermore, the ALJ in making that determination is only bound by the treating source's opinion on what the individual can do when that opinion meets the standards set out in 20 C.F.R. § 404.1527(d)(2). As noted above, that regulation and SSR 96-2p give controlling weight to a treating source opinion only when that opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent" with other substantial evidence in the record.

In the present case ALJ Harper found "the conclusions by Dr. Schaeffer *as to the claimant's residual functional capacity*, to be inconsistent with the substantial evidence of the record" and gave them minimal weight (R. 22). ALJ Harper went on to state that medical source opinions were only given controlling weight when supported by sufficient medical data and consistent with the record and also indicated that Dr. Schaeffer's opinion regarding Plaintiff's RFC was a decision left to the Commissioner and, as such, were not entitled to controlling weight or special significance.

Indeed, neither the record as a whole nor Dr. Schaeffer's medical notes contain any objective medical evidence of arthritis in Plaintiff's hips or left knee, and the October 16, 2002, right knee x-ray and MRI showed only mild degenerative changes and possible ligament tears (R. 193-194). Further, the record does not contain any evidence that Plaintiff followed up with an

orthopedist for these complaints as Dr. Schaeffer repeatedly suggested. Physical exams showed only some mild crackling in his knees but no abnormalities or obvious inflammation or arthritic changes and normal reflexes and motor function, full range of motion (with pain at full extension) (157, 173, 178, 212).

The record does contain objective evidence, a December 2002 nerve conduction study, to support Plaintiff's bilateral carpal tunnel syndrome (R. 152). Yet, in February 2003 Plaintiff reported no problems with fine motor skills in his hands (he could open a jar, button clothes, pick up coins and tie shoe laces) (R. 153). On October 15, 2004, Plaintiff complained that the carpal tunnel pain had increased, but he continued to refuse the surgical intervention suggested by Dr. Schaeffer and there is no objective medical evidence to support a worsening of his symptoms.

There is no evidence in any of the medical records that Plaintiff complained of fatigue, drowsiness, inability to concentrate, focus or sleep or need to recline for five to seven hours per day. Additionally, though it is undisputed that Plaintiff has heart disease, Plaintiff repeatedly denied any chest pain or shortness of breath on regular examinations, apart from the notes taken before his October 2002 cardiac catherization and the February 2003 exam by the DDS examiner. In fact, Dr. Schaeffer did not list heart disease or obesity as impairments that contributed to his December 2004 opinion that Plaintiff was unable to work (R. 207). Further, Plaintiff was counseled many times to quit smoking, lose weight and exercise to alleviate his symptoms and there is no evidence in the record to show that he complied.

A treating physician's opinion can be discounted or even rejected where, as here, there is evidence that the treator's opinion is: based solely on the claimant's statements to the treator, *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); not supported by objective evidence, *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); or where there is contradictory evidence in

the record, *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004) (ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir.2001) or when the treating physician's opinion is internally inconsistent, *Clifford* [*v. Apfel*], 227 F.3d [863] at 871 [7th Cir. 2000)], as long as he 'minimally articulate[s] his reasons for crediting or rejecting evidence of disability,' *id.* at 870.).[3]

Lastly, as stated above, a claimant's RFC is a decision left to the Commissioner and a treator's opinion on this issue is not controlling. *See* SSR 96-5p and 20 C.F.R.§§404.1527(e) and 429.927(e). Accordingly ALJ Harper's decision to discount Dr. Schaeffer's opinion about Plaintiff's RFC is supported by substantial evidence and should not be disturbed.

   2. *RFC Finding*

Regulations of the Social Security Administration provide for denial of benefits where a claimant willfully fails to follow prescribed treatment. *Young v. Califano*, 633 F.2d 469, 472 (6th Cir. 1980); citing 20 C.F.R. §404.1518 (1979), now 20 C.F.R. §404.1530 (". . . an individual who willfully fails to follow such prescribed treatment cannot by virtue of such failure be found to be under a disability. Willful failure does not exist if there is justifiable cause for failure to follow such treatment."). Plaintiff's failure to present a justifiable cause for his failure to follow Dr. Schaeffer's advice that he lose weight, quit smoking, follow-up with an orthopedist and consult a hand surgeon regarding his carpal tunnel syndrome is significant to the denial of his claim for benefits. Section 404.1530(b) warns that "[i]f you do not follow the prescribed treatment without

---

[3]*but see, Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004) (Generally, if a consulting physician examines a claimant only once, his or her opinion is not considered substantial evidence, especially if the treating physician contradicts the consulting physician's opinion. *Lauer*, 245 F.3d at 705; *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir.1992). However, 'an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment.' *Harris*, 356 F.3d at 931 (citing *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir.2000); 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)).

a good reason, we will not find you disabled . . . ."  ALJ Harper cites  20 C.F.R. §404.1530 and Plaintiff's failure to follow Dr. Schaeffer's advise on diet and exercise and to quit smoking in making his determination (R. 22).  There is no indication that Plaintiff meets any of the excuses set out in §404.1530 for non-compliance.

In addition to the denial of benefits under §404.1530, refusal to follow prescribed treatment can be used by an ALJ as a justification for discounting a claimant's credibility as to the severity of his symptoms.  *O'Donnell v. Barnhart,* 318 F.3d 811, 819 (8th Cir.2003) (failure to follow prescribed treatment may, in some cases, undermine claimant's credibility.)

Further, there is substantial evidence in the record to support ALJ Harper's finding that Plaintiff could perform a limited range of light work.  In addition to the lack of objective evidence supporting Plaintiff's allegations of disabling pain, as cited in the previous section, the information Plaintiff provided in his pre-hearing forms indicates that he can lift up to 20 pounds occasionally, stand for 30 minute intervals and sit as long he is able to adjust his position from "time to time" (R. 105).  At the February 2003 exam by the DDS examiner, Plaintiff reported that he could stand for an hour, walk for 15 minutes and sit for 45 minutes (R. 153).  At the hearing he testified that he could not perform any job, even if provided a sit/stand option.  Yet, there is no evidence in the record to support such a worsening of his condition – neither subjective complaints to treators of an inability to sit or stand, nor objective medical evidence of such a progression of his impairments.

Therefore, ALJ Harper's finding that Plaintiff could perform a limited range of light work is also supported by substantial evidence and should not be disturbed.

### III.   RECOMMENDATION

For the reasons stated above, it is Recommended that Defendant's Motion for Summary

Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections, which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 31, 2006  s/Steven D. Pepe
Ann Arbor, Michigan  United States Magistrate Judge

Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means and or U. S. Mail on August 31, 2006.

s/Deadrea Eldridge
Courtroom Deputy Clerk