UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNNY MONROE,

       Plaintiff,

v.                                           CIVIL CASE NO. 05-73259
                                           HON. MARIANNE O. BATTANI

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

_____/

**OPINION AND ORDER ADOPTING
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.    INTRODUCTION**

Plaintiff Johnny Monroe brings this action under 42 U.S.C. § 405(g) challenging a final decision of defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") under sections 216(I) and 223 of the Social Security Act. The case was referred to Magistrate Judge Steven D. Pepe pursuant to 28 U.S.C. § 636(b)(1)(B) to review cross-motions for summary judgment. The Magistrate Judge issued a Report and Recommendation ("R&R") on August 31, 2006, recommending Plaintiff's motion for summary judgment be denied, and that Defendant's Motion for Summary Judgment be granted.

On September 23, 2002, Monroe filed an application for DIB alleging an onset date of October 1, 2000, due to "heart problems, diabetes & arthritis problems w/ rt knee." (AR 3, 67-69, 86). After Monroe's application was initially denied, on March 11, 2005, Monroe presented his case to Administrative Law Judge ("ALJ") Don A. Harper. On April 12, 2005,

ALJ Harper issued a decision finding Monroe not disabled. (AR 17-25). The Appeals Council denied Monroe's request for review. (AR 5-8).

In the R&R, the Magistrate Judge found that ALJ Harper's finding that Monroe could perform a limited range of light work was supported by substantial evidence and should not be disturbed. Specifically, the Magistrate Judge found ALJ Harper's decision to discount Monroe's treating physician's opinion about Monroe's Residual Functional Capacity ("RFC") was supported by substantial evidence because there is evidence that the treating doctor's opinion is based solely on the claimant's statements, is not otherwise supported by objective evidence, and there is contradictory evidence in the record regarding Monroe's RFC. The Magistrate Judge also found that Monroe's failure to follow his doctor's advice to quit smoking, lose weight, follow-up with an orthopedist, and consult a hand surgeon supported the ALJ's decision to deny benefits, and impacted his credibility regarding his ability to work.

On September 8, 2006, Monroe filed Objections to the R&R, contending that the Magistrate Judge incorrectly took into account Monroe's inability to stop smoking and lose weight as factors to discount his credibility about his pain and inability to perform light job duties with a sit/stand option.

For the reasons stated below, the Court ADOPTS the Magistrate Judge's R & R.

**II.    STANDARD OF REVIEW**

A district court must conduct a *de novo* review of the parts of a magistrate judge's report and recommendation to which a party objects. 28 U.S.C. § 636(b)(1). The district "court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." Id. The requirement of *de novo* review "is a statutory recognition that Article III of

the United States Constitution mandates that the judicial power of the United States be vested in judges with life tenure." United States v. Shami, 754 F.2d 670, 672 (6th Cir. 1985). Accordingly, Congress enacted 28 U.S.C. § 636(b)(1) to "insure[] that the district judge would be the final arbiter" of a matter referred to a magistrate judge. Flournoy v. Marshall, 842 F.2d 875, 878 (6th Cir. 1987).

Judicial review in a social security appeal is limited to determining whether there is substantial evidence supporting the ALJ's decision and whether the judge applied the correct legal standards in reaching that decision. Elam v. Comm'r of Soc. Sec., 348 F.3d 124,125 (6th Cir. 2003), 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If substantial evidence supports a denial of benefits, that decision is not subject to reversal, even if the reviewing court determines that substantial evidence supports a contrary decision. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986) (en banc); Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

When determining whether the decision is supported by substantial evidence, the reviewing court must take into consideration the entire record, including "whatever in the record fairly detracts from its weight." Mullen, 800 F.2d at 545 (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1971)). However, the court may not review the evidence *de novo*, make determinations of credibility, or weigh the evidence. Brainerd v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989). Consequently, the substantial evidence standard accords "considerable latitude to administrative decision makers," as "[i]t presupposes

3

that there is a zone of choice within which the decision makers can go either way, without interference by the courts." Mullen, 800 at 545 (citations and internal quotations omitted).

### III.   STATEMENT OF FACTS

#### A.   Medical Evidence

An October 31, 2000, Cardiolite stress test revealed an anterior wall scar with surrounding ischemia, inferior wall scar with fixed perfusion defect and an left ejection fraction of 45%. (AR 192). On November 1, 2000, Monroe was hospitalized overnight when he experienced acute myocardial infarction due to coronary artery disease. (AR 122). Tests showed a 99-percent occlusion of the left anterior descending artery, which was treated through angioplasty and placement of a stent. (AR 122). The procedure was performed without complications and resulted in restored blood flow. (AR 127).

On August 28, 2002, Monroe visited Michael Schaeffer, M.D., as a new patient. (AR 145). He reported that he did not follow up with a cardiologist for his atherosclerotic heart disease (ASHD). He also reported that he took his medication without difficulty; but was not experiencing chest pain, shortness of breath, headaches, visual changes, numbness, tingling in his extremities, or swelling in his ankles. He also reported that he had diabetes. Monroe then went on to describe a six-month history of right knee pain related to a car accident. Dr. Schaeffer's examination revealed a small amount of right knee effusion and joint laxity, but full range of motion with some pain at the end of extension. (AR 145). He opined that Monroe had ASHD, diabetes mellitus type 2, hyertension, hypercholesterolemia, and right knee pain. He refilled Monroe's Vicodin prescription, referred him to an orthopedist regarding his knee, and ordered a stress test and fasting bloodwork. (AR 146).

A September 6, 2002, cardiac stress test suggested stress-induced ischemia, a below normal ejection fraction and hypokinesia in the apex, adjacent anterior wall, and part of the septum. (AR 149). The following month, on October 1, 2002, Monroe, who complained of shortness of breath and fatigue, underwent a left cardiac catherization, left and right selective coronary angiogram, and a left ventricular angiogram. The tests revealed that the stented artery was patent with no occlusion, and that Monroe had normal left ventricular systolic function with mild coronary artery disease. (AR 131, 139). His ejection fraction was normal. (AR 137-138).

On September 9, 2002, Monroe was seen by Kevin T. Crawford, D.O., for right knee pain that resulted from an automobile accident two and a half months earlier. (AR 194). The knee had swollen on and off since the accident for five days to two weeks at a time. His knee pain was most prevalent after long working days. Monroe also complained of right elbow pain that was exacerbated by increased activity. A physical exam revealed no gross deformity in the right knee, full range of motion, with an inability to actively extend to zero degrees, full strength, laxity of the anterior cruciate ligament and some point tenderness. The right elbow was tender posterolaterally with full range of motion. Pain was present at extremes of passive flexion and active supination. Monroe had full strength and neurovascular competency. X-rays revealed mild degenerative changes in the right knee, including flattening of the tibial plateau and spurring. A October 16, 2002, right knee MRI revealed no joint effusion or bone contusion, but a possible partial anterior cruciate ligament tear and/or tenosynovitis and possible grade 1 tear or myxodegeneration of the anterior horn of the lateral meniscus. (AR 193).

On October 24, 2002, Dr. Crawford explained that arthroscopic surgery could provide some relief of Monroe's knee pain but would not improve the arthritis. Thus, he could not

"overwhelmingly" recommend the surgery. (AR 195). December 16, 2002, nerve conduction studies showed evidence of carpal tunnel syndrome bilaterally, right greater than left, with no evidence of peripheral neuropathy. (AR 152, 196).

At the request of the state agency, John Boston, D.O., examined Monroe on February 14, 2003. (AR 153-58). Monroe complained of "occasional" chest pain that occurred about once a month and lasted for five minutes and was accompanied by shortness of breath. (AR 153). He reported smoking one pack of cigarettes each day. He also complained of back and knee pain, reporting that he could stand for one hour, walk for 15 minutes and sit for 45 minutes. He reported no problem lifting as long as he did not have to use his knees. He also described right hand numbness, but said he could open a jar, button clothes, pick up coins and tie shoelaces without difficulty. On examination, Dr. Boston observed no obvious joint deformities and noted Monroe had a normal range of motion with pain. (AR 155). Monroe walked normally without an assistive device, had no muscle spasm and full dexterity and grip strength in his hands, and he could pick up coins, button, and open a door with both hands. There was moderate difficulty squatting and an inability to hop, but no difficulty getting on or off of the examination table and no difficulty heel and toe walking. Reflexes were normal and motor function was 5/5 with the exception of the left lower extremity, which was 4/5. (AR 157). Sensation was decreased in the C8 area of his right arm.

On February 18, 2003, upon referral from Dr. Schaeffer, cardiologist Rajesh C. Gulati, M.D., examined Monroe. (AR 189). Dr. Gulati recommended continuing his current medical therapy and regular visits with Dr. Schaeffer. Monroe also saw Dr. Schaeffer on February 18, 2003, reporting no chest pain, shortness of breath, headaches, visual changes, or numbness in his

feet. (AR 190). He continued to complain of numbness and tingling in both hands due to carpal tunnel, along with pain in his right knee. He also reported that he was following up with orthopedics. Dr. Schaeffer's examination showed no abnormalities. Dr. Schaeffer counseled on smoking cessation and weight loss and advised Monroe to see a hand surgeon.

On February 26, 2003, "S. Torrez, Enhanced Examiner," completed the Physical Residual Capacity Assessment Form, and opined that Monroe could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk 6 hours in an 8-hour workday, sit for 6 hours in an 8 hour workday and occasionally climb, balance, stoop, kneel, crouch and crawl. (AR 160-161). The examiner indicated that, although Monroe complained of pain and an inability to do work around the house or shopping, there was no medical evidence to support his
inability to do such activities. (AR 164).

On March 21, 2003, Monroe reported a new complaint of left-sided low back pain and explained that his wife was worried that he had a kidney stone. (AR 178). Dr. Schaeffer's examination showed diffuse discomfort over the left paraspinal muscles and a positive straight leg-raise test. He observed no back swelling, no pain with palpation, good hip motion, no obvious sensory or motor deficits and intact reflexes. Dr. Schaeffer thought Monroe had a possible lumbar strain and recommended use of a heating pad and Vicodin for pain.

At his next visit in May 2003, Monroe reported feeling "fairly well," though he was still bothered by hand discomfort and knee pain. (AR 175). He complained of frequent discomfort from bilateral carpal tunnel and knee pain, and reported having good days and bad days. He requested that his Vicodin prescription be changed to allow him to use more of the medication as

needed. Dr. Schaeffer declined this request, explaining that if he really needed more than four tablets per day, this indicated a worsening of his symptoms and he would need to consider surgical intervention. (AR 176). Dr. Schaeffer refilled his prescriptions and counseled on diet and smoking cessation.

On an August 26, 2003, visit, Monroe complained to Dr. Schaeffer of pain in both knees, as well as his hips, elbows and shoulders, but no chest pain or difficulty breathing. (AR 173). Dr. Schaeffer's examination showed no obvious inflammation or arthritic changes in Monroe's shoulders, elbows, wrists or hips, and he recommended heat and low impact exercise to improve joint symptoms. Dr. Schaeffer diagnosed probable osteoarthritis, bilateral carpal tunnel, diabetes, hypertension, hypercholesterolemia, and ASHD. Dr. Schaeffer also ordered blood tests to check Monroe's diabetes control. Monroe returned on November 12, 2003, having neglected to undergo the blood tests, explaining that he had been very busy babysitting his grandchildren. (AR 171). Monroe was still smoking one pack of cigarettes per day and expressed concern regarding his inability to lose weight. He also complained of bilateral carpal tunnel pain in his hands and arthritic pain in both knees, hips, low back, and neck. He continued to refuse surgical intervention for his hands, and was not experiencing chest pain or difficulty breathing. Dr. Schaeffer diagnosed ASHD, diabetes, hypercholesterolmemia, hypertension, bilateral carpal tunnel syndrome, osteoarthritis, and tobacco addiction. Dr. Schaeffer advised him to follow-up with an orthopedist for his knee and counseled him regarding diet and exercise.

On February 13, 2004, Monroe reported to Dr. Schaeffer that his hand and knee pain continued, but he was not experiencing any chest pain, difficulty breathing, or swelling in his ankles. (AR 210).

On October 15, 2004, Monroe complained of increased carpal tunnel pain and arthritic type pain in his wrists, hands and knees. (AR 212). Dr. Schaeffer's examination showed both hands were normal to inspection, no obvious joint inflammation, mild crepitus (a crackling or grating sound) in his knees, and no other obvious abnormalities. Dr. Schaeffer discussed adding a new medication, Neurontin, but Monroe refused. He also refused an evaluation by a hand surgeon or further work-up by an orthopedist. Dr. Schaeffer again counseled him on diet and exercise.

On December 8, 2004, Monroe complained that his knees were "a little worse" and his fingers on his right hand were swollen. (AR 213). He requested a referral to orthopedics and an arthritis work-up. Dr. Schaeffer observed mild arthritic changes in the PIP and DIP joints of Monroe's hands, but no active synovial inflammation, some crepitus in his knees, but no active inflammation and no obvious effusion or erythema. Dr. Schaeffer felt the swelling in the right hand was likely due to carpal tunnel syndrome. Monroe again refused a referral to a hand specialist or "any intervention" for his hands. Dr. Schaeffer referred Monroe to an orthopedist for consideration of a steroid injection. Dr. Schaeffer also completed a Physical Capacities Evaluation Form, in which he opined that Monroe could sit for two hours per day, stand for two hours per day, and walk one half to one hour per day. (AR 203). He indicated that Monroe needed to lie down for substantial periods during the day, needed complete freedom to rest frequently without restriction, and could not use his hands for grasping, pushing, pulling or manipulating. (AR 203-205). He also opined that Monroe could occasionally lift and/or carry 11-20 pounds and frequently lift and/or carry 10 pounds, but could never stoop, squat, crouch, crawl or climb, or work around unprotected heights or moving machinery. (AR 204-5).

9

However, Dr. Schaeffer did not limit Monroe's ability to occasionally be exposed to marked changes in temperature, reach above his shoulders, or drive automotive equipment. (AR 206). Dr. Schaeffer listed Monroe's bilateral carpal tunnel syndrome and osteoarthritis in the knees and hips requiring narcotic medication, as well as EMG studies of his hands, as the basis for his opinion in limiting Monroe's physical activities. (AR 207).

A January 1, 2005, Cardiolite stress test revealed a slightly enlarged left ventricle, when compared to his September 2002 study. (AR 208). On February 1, 2005, Monroe was seen for a follow-up after angioplasty. (AR 214). He reported feeling good since the procedure, though his hips and knees were bothering him significantly. He indicated that he scheduled a follow-up with his orthopedist. Dr. Schaeffer again counseled Monroe on "lifestyle changes."

In his Pain Questionnaire, Monroe indicated that he began experiencing pain in October 2000 after having a heart attack. (AR 103). His pain was getting worse with time; was located in his knees, hands, elbows, shoulders and left foot; and, was aggravated by walking and standing. Pain medication and resting improved the pain, which was described as constant and present 90% of the time. He took Vicodin ES and 800 milligrams of Motrin 3 times per day, which took about 30 minutes to work, did not completely relieve his pain, and caused some drowsiness. (AR 104). He did not undergo physical therapy and used rest and heat to alleviate pain. He could walk one block in 2 minutes before he had to stop due to knee pain and shortness of breath. He could stand in 30 minute intervals, lift and carry 20-25 pounds, and had "some" limitations in using his arms and hands. (AR 105). He needed to change position "from time to time" when sitting and also listed shortness of breath under "other limitations." His doctor had not limited

his activities and he was able to take care of his own personal needs, though he stated that he only did "what is needed when able."

In his Daily Activities Form, Monroe indicated that he usually went to bed at 9:00 p.m. and awoke at 8:00 a.m., though he had trouble sleeping because arthritis pain woke him up. (AR 106). He sometimes took naps during the daytime for an hour if he was tired. He did not require special help with his personal needs and his condition had caused no changes in his ability to care for himself. He did not fix his own meals because his wife did all the cooking for his whole family. He did not do any housework, or shopping. (AR 107). He did not read or have any hobbies but watched television and visited with family when they came to his home. (AR 108). He used to hunt, but was no longer able.

      B.      **Hearing Testimony**

            1.      **Monroe's Testimony**

At the time of the hearing, Monroe was 45 years old and married with no minor children. (AR 228). He completed the tenth grade and stated that he could not read or write very well. (AR 228-29). He could not read cursive and could do only minimal math. (AR 229). Monroe was 6 feet tall and weighted 300 pounds. (AR 230). His impairments began in October 2000, and caused him to stop working in 2002. He last worked as a mechanic performing as a heavy repair specialist. (AR 231). He testified that, although he stopped working because of his heart trouble, his more serious problem was pain in his knees, hips, and hands. (AR 232). He experienced fatigue, pain and an inability to concentrate when he was working.

He stopped working in 2000 due to a heart attack, which he explained caused him to be drowsy, unable to focus, and required "a lot of medications." (AR 233). He had pain and

throbbing in his knees, could stand for 15 minutes to one-half hour, and could sit for one-half hour to one and one-half hours. He believed pain, drowsiness, inability to focus, and inability to sit or stand for long periods of time prevented him from performing a light job which allowed a sit/stand option. (AR 233-234, 236).

He testified that he spent his days moving around trying to get comfortable, and spent five to seven hours each day laying down in a recliner with his legs elevated. (AR 234). He took naps during the daytime and did not sleep at night. His medications made him drowsy and weak, and left him unable to concentrate. His daily activities included "making sure the bathroom is picked up," placing the garbage outside the door, or putting away dishes. (AR 235). He did not do yard work nor leave the home to go out or do shopping, though he did occasionally go out to eat. He could make himself a sandwich or cereal, but did not cook. He drove approximately once a week. (AR 237).

### 2. The Vocational Expert

Vocational expert ("VE") Samuel Goldstein, Ph.D., testified at the administrative hearing (AR 39, 225, 239-41). ALJ Harper asked VE Goldstein to consider a hypothetical individual of Monroe's age, education, and work experience that could perform work at the light level of exertion, but was limited to no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; had to avoid pushing and pulling with the upper and lower extremities; and, needed to avoid climbing and descending stairs. (AR 239-240). VE Goldstein testified that such an individual could not perform Monroe's past work, but could perform work as an inspector or packager, with approximately 15,000 to 17,000 such jobs existing in the regional economy. (AR 240).

ALJ Harper then asked VE Goldstein to consider the same hypothetical person with the additional limitations of fatigue, drowsiness, and significant pain that prohibited the ability to perform a one or two step job.  VE Goldstein indicated that such a person could not perform Monroe's past work, nor any competitive employment.

### C.    The ALJ's Decision

ALJ Harper found that Monroe met the non-disability requirements and was insured for benefits through the date of his decision.  (AR 24).  Monroe's coronary artery disease, bilateral carpal tunnel syndrome, right knee osteoarthritis, diabetes, and obesity were considered severe impairments based on the requirements in the Regulations, 20 C.F.R. §§404.1520(c) and 416.920(c), but these impairments did not meet or equal on of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

ALJ Harper discounted Monroe's credibility regarding his alleged limitations because: his allegations about his daily activities were not consistent with the evidence of record; he did not follow his doctor's advice regarding diet and exercise; and, he denied chest pain, shortness of breath, headaches, or visual changes because of his heart disease.

ALJ Harper also found that, although Monroe was unable to perform his past work and had no transferrable skills, he had the RFC to perform work at the light exertional level with the following restrictions: occasional climbing, stooping, crouching, kneeling and crawling; avoid pushing and pulling motions with upper and lower extremities; and, avoid ascending or descending stairs.  (AR 24-25).

ALJ Harper, using the Medical-Vocational Rule 202.18 as a framework and relying upon VE Goldstein's testimony, found that although Monroe's exertional limitations did not allow

13

him to perform the full range of light work, there were a significant number of jobs in the national economy he could still perform. Accordingly, ALJ Harper found Monroe was not under a disability as defined in the Social Security Act.

## IV.     ANALYSIS

In order to establish a compensable disability under the Social Security Act, a claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted, or can be expected to last, for a continuous period of not less than 12 months. 42 U.S.C. § 1382(a)(3)(A). The claimant bears the ultimate burden of establishing a disability within the meaning of the Social Security Act. Casey v. Sec'y of Health & Human Servs., 987 F.2d 1230, 1233 (6th Cir. 1993).

Disability claims are evaluated through a five-step sequential process. 20 C.F.R. § 404.1520. See also Kirk, 667 F.2d at 529. The burden of proof to show a disability is on the claimant through the first four steps of the process. If a claimant meets this burden, the fifth step shifts the burden to the Commissioner. Preslar v. Sec'y of Health and Human Serv., 14 F.3d 1107, 1110 (6th Cir. 1994). The first step of the process examines whether the claimant is currently engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled under the guidelines. The second step examines whether the claimant has a severe impairment which significantly limits her ability to perform work-related functions. Id. If a severe impairment is found, the third step requires comparison of the impairment to those impairments listed in Appendix I, 20 C.F.R. § 404, Subpt. P (1981), to determine if, on the medical evidence alone, the claimant is disabled. Id. If the claimant is not disabled under the third step, the fourth

step requires a determination of whether the claimant can perform relevant past work.  If claimant cannot perform relevant past work, the fifth step shifts the burden to the Commissioner to establish that the claimant has transferable skills which enable him to perform other work in the national economy.  Id.

The ALJ rendered findings favorable to Monroe at the first four steps of the disability determination process, thus, the question before the Court is whether Monroe is disabled under step five of this analysis; that is, whether Monroe retains the RFC to perform other work existing in significant numbers in the national economy.  The ALJ found that, although Monroe did not possess the RFC to perform his past relevant work, he retained the RFC to perform a significant range of light work because his claimed level of incapacity was not wholly credible, and that his treating physician's assessment of his RFC was not supported by substantial evidence.

In making his credibility determination, the ALJ determined that Monroe's assertions about his limitations were not consistent with the evidence in the record.  Also in support of his conclusion, the ALJ cited an occurrence where Monroe did not get requested blood tests because he was too busy babysitting his grandchildren.

ALJ Harper also found that his claimed limitations were contradicted by record evidence, and noted that two orthopedists, Drs. Crawford and Boston, found that Monroe was not significantly limited in his range of motion or strength in his hips and knees.  (AR 153, 194). ALJ Harper also found that the absence of complaints of chest pain, shortness of breath, headaches, or visual changes inconsistent with Monroe's claimed limitations.  As a separate basis for his conclusion, ALJ Harper found that denial of benefits was proper because Monroe was not following his doctor's advice regarding diet, exercise, and smoking.

Monroe's first objects to the Magistrate Judge's finding that the ALJ's RFC determination was supported by substantial evidence, even though that finding is contrary to his treating physician's opinion.  Dr. Schaeffer opined that Monroe's carpal tunnel syndrome, arthritic hips and knees, and use of daily narcotics rendered Monroe unable to perform light work.  As mentioned above, judicial review in a social security appeal is limited to determining whether there is substantial evidence supporting the ALJ's decision and whether the judge applied the correct legal standards in reaching that decision.  Elam, 348 F.3d at 125, 42 U.S.C. § 405(g).  If substantial evidence supports a denial of benefits, that decision is not subject to reversal, even if the reviewing court determines that substantial evidence supports a contrary decision.  Mullen, 800 F.2d at 545.  Here, the ALJ discounted Monroe's treating physician's opinion because of contradictory record evidence existed regarding the severity of his carpal tunnel syndrome and arthritis.

"A treating physician's opinion is normally entitled to substantial deference, but the ALJ is not bound by that opinion[,]" if  it is not supported by sufficient medical data.  Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 477 (6th Cir.  2003).  The Court finds that the ALJ's decision to discount Monroe's treating physician's RFC was proper because it was not supported by sufficient medical data.

In September 2002, Mr. Monroe visited orthopedist Kevin Crawford regarding his right knee pain. (AR 194).  Dr. Crawford observed some laxity of the anterior-cruciate ligament, but no gross deformity of the knee with full passive range of motion and full strength.  (AR 194).  X-rays showed mild arthritis, and Dr. Crawford recommended an MRI, which showed possible tears in two areas.  (AR 193, 194).  In October 2002, Dr. Crawford commented that arthroscopic

16

surgery was an option for the possible tears, but would not improve the underlying arthritis. (AR 195). Dr. Crawford did not "overwhelmingly" recommend surgery, but noted that he would arrange the procedure if Mr. Monroe's symptoms continued. (AR 195). A December 2002 nerve conduction studies showed evidence of carpal tunnel syndrome with no evidence of peripheral neuropathy. (AR 152, 196).

Monroe described right hand numbness, but said he could open a jar, button clothes, pick up coins, and tie shoelaces without difficulty. (AR 153). On examination, Dr. Boston observed no obvious joint deformities and normal range of motion. (AR 155). Monroe walked normally without an assistive device. (AR 155). He had no muscle spasm and full dexterity in his hands, and he could pick up coins, button his clothes, and open a door with both hands. (AR 155). Monroe had moderate difficulty squatting but no difficulty getting on or off of the examination table and no difficulty heel and toe walking. (AR 155). In March 2003, Dr. Schaeffer's examination showed diffuse discomfort over the left paraspinal muscles and a positive straightleg-raise test. (AR 178). Dr. Schaeffer observed good hip motion, no obvious sensory or motor deficits, and intact reflexes. (AR 178). In August 2003, Monroe reported pain in both knees, as well as his hips, elbows and shoulders; however, Dr. Schaeffer's examination showed no obvious inflammation or arthritic changes. (AR 173). Monroe expressed dismay that he could not lose weight due to hand pain and knee pain; however, he was not interested in surgery for his hands. (AR 171).

In October 2004, Mr. Monroe complained of increased pain particularly in his hands. (AR 212). Dr. Schaeffer's examination showed both hands were normal to inspection and had no obvious joint inflammation. (AR 212). Dr. Schaeffer discussed adding a new medication, but

17

Monroe was not interested. (AR 212). Monroe also refused an evaluation by a hand surgeon or further work-up by an orthopedist. (AR 212). In December 2004, Dr. Schaeffer observed some crepitus in Monroe's knees, but no active inflammation or obvious effusion. (AR 213). He again recommended further evaluation by an orthopedist for a possible knee injection. (AR 213). Dr. Schaeffer also urged Monroe to see a hand specialist, but he refused. (AR 213).

  The record is replete with evidence that contradicts Dr. Schaeffer's RFC determination, supports the ALJ's decision to discount Dr. Schaeffer's RFC finding, and supports the ALJ's determination that Monroe could perform light work. In addition, the record shows that Monroe repeatedly declined to seek more aggressive treatment for his allegedly disabling impairments, even when Dr. Schaeffer urged him to do so. (AR 171, 212, 213). Monroe's activities, his conservative course of treatment, medical examinations from orthopedists that contradict the claimed severity of his condition, and his failure to follow through with recommendations to consult specialists and consider surgery, cast doubt on the credibility of his complaints, and detract from Dr. Schaeffer's opinions of disability. See 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4), 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v). Therefore, the Court finds the ALJ's RFC determination is supported by substantial evidence.

  Monroe also objects to the R&R's finding that the ALJ properly discounted his credibility about his pain and alleged limitations based on his failure to follow his doctor's advice to stop smoking, exercise, and alter his diet. The Court finds that it was improper for the ALJ to deny benefits on this basis. An ALJ may deny benefits if the claimant does not follow prescribed treatment for his alleged disabling condition. Awad v. Sec'y of Health & Human Servs., 734 F.2d 288, 289-90 (6th Cir. 1984). However, it is only a claimant's unwillingness to

undergo prescribed treatment that could relieve his disabling symptoms that undermines the claimant's credibility regarding his claimed disabling condition.  Id., Sias v. Sec'y of Health & Human Servs., 861 F.2d 475, 480 (6th Cir. 1988).  There is no evidence that Dr. Schaeffer's recommendations were prescribed treatments for Monroe's alleged disabling arthritic pain in his knees and hips, and carpal tunnel syndrome in his hands.  The recommended courses of action are more logically related to his heart disease, diabetes, and obesity.  Monroe does not argue that either his diabetes or obesity contribute to his inability to work.  Although he does assert that his medication to control his heart disease leads to drowsiness, there is no evidence that losing weight would allow him to discontinue the medication.  However, this infirmity in the R&R is insufficient to overcome the determination that the denial of benefits was otherwise proper.  Therefore, having conducted a *de novo* review of the portions of the R&R to which Plaintiff objects, the Court finds that the denial of Plaintiff's claims for benefits is supported by substantial evidence.

**IV.    CONCLUSION**

Accordingly, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation, **GRANTS** Defendant's Motion for Summary Judgment, and **DENIES** Plaintiff's Motion for Summary Judgment.

```
                                s/Marianne O. Battani
```
                                MARIANNE O. BATTANI
                                UNITED STATES DISTRICT JUDGE

DATED: **September 29, 2006**

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon Magistrate Steven D. Pepe, Kenneth Laritz, and Janet Parker, on this date via the ECF System.

s/Bernadette M. Thebolt<br>
DEPUTY CLERK